# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

CHESAPEAKE OPERATING, INC. and
CHESAPEAKE EXPLORATION, L.L.C.,

      Plaintiffs,

vs.                                            No. CIV 11-0314 JB/CG

GARNER'S WELL SERVICE, L.L.C. and
DEVIN GARNER,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Default Judgment, filed October 14, 2011 (Doc. 13). The Court held an evidentiary hearing on December 13, 2011. The primary issues are: (i) whether the Court should award Plaintiffs Chesapeake Operating, Inc. and Chesapeake Exploration, L.L.C. (collectively "Chesapeake") their requested damages; and (ii) whether the Court should enter a permanent injunction consistent with the terms Chesapeake has requested. Because the Court concludes that Chesapeake has presented sufficient evidence to support its requested award of damages, the Court will award Chesapeake $81,539.23 in damages. The Court will enter a permanent injunction against Garner and Garner's Well Service consistent with the terms of this Memorandum Opinion and Order allowing Chesapeake to enter the land containing the Dana Federal 1 well in Chaves County, New Mexico, to plug the well, and to remove itself as the registered owner/operator of the well.

## FINDINGS OF FACT

"[A] court may not enter a default judgment" regarding the amount of damages "without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation."

Venable v. Haislip, 721 F.2d 297, 300 (10th Cir. 1983).  Accord Marcus Food Co. v. Dipanfilo, No. 10-3285, 2011 WL 5084997, at *9 (10th Cir. Oct. 27, 2011).  The Court held an evidentiary hearing on December 13, 2011.  The following findings of fact will serve as the Court's findings for purposes of entering a default judgment on the amount of damages to award to the Plaintiffs pursuant to rule 55 of the Federal Rules of Civil Procedure.  Because the Defendants did not appear at the hearing, there were no objections to the admissibility of any evidence presented at the hearing. The Court notes that many of these findings would not be necessary if the Court were only awarding damages.  Chesapeake, however, also seeks equitable relief, which turns to a greater degree on the specific facts of a case than the question of damages.  See Insure N.M., LLC v. McGonigle, 128 N.M. 611, 614, 995 P.2d 1053, 1056 (Ct. App. 2000).[1]

     1.      The well that is the focal point of this dispute is called the Dana Federal 1, which is located in Chaves County.[2]  See Transcript of Hearing at 19:11-12 (taken December 13, 2011)(Finnell)("Tr.").[3]

---

[1]The United States Court of Appeals for the Tenth Circuit "appl[ies] the law of the forum state in determining whether to grant mandatory injunctive relief in diversity cases."  Mid-America Pipeline Co. v. Lario Enters., 942 F.2d 1519, 1523 (10th Cir. 1991).

[2]At the hearing, Chesapeake clarified that its pleadings inaccurately referred to Lea County, New Mexico as the location of the Dana Federal 1 well as opposed to the correct county, Chaves County.  See Transcript of Hearing at 41:8-16 (taken December 13, 2011)(Court, DeBrine).  After entering default judgment, the Court takes all of the well-pleaded facts in a complaint as true.  See United States v. Craighead, 176 F.App'x 922, 925 (10th Cir. 2006)(unpublished).  A party may, however, generally choose to forego a benefit that a particular procedural rule provides them.  See United States v. Noble, 175 F.App'x 185, 189 (10th Cir. 2006)(unpublished)("The government is free to forego the benefit provided by Rule 27.2 and seek enforcement of a valid waiver as part of its brief on the merits.").  Additionally, the Court must still make the finding of the location of the well in its determination of appropriate equitable relief.  Thus, the Court finds, for purposes of damages and liability, that the well is located in Chaves County.

[3]The Court's citations to the transcript of the hearing refers to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

2.      Chesapeake[4] sold its interest in the property that housed this well through an online auction house.  See Tr. at 19:21-24 (Finnell).

3.      Chesapeake Operating has, at all relevant points in time, been listed as the recognized and approved operator of the Dana Federal 1 well with the United States Department of Interior, Bureau of Land Management ("BLM").  See Complaint for Breach of Contract, Misrepresentation, Specific Performance, and Injunctive Relief ¶ 10, at 2, filed April 15, 2011 (Doc. 1)("Complaint").

4.      Garner's Well Service was the highest bidder for that interest.  See Tr. at 19:24-25 (Finnell).

5.      Chesapeake and Garner's Well Service entered into an agreement regarding the purchase of the well to assign that interest to Garner's Well Service.  See Wellbore Assignment, Bill of Sale and Conveyance at 1-4 (dated October 9, 2008)(Plaintiff's Exhibit 1)("Agreement"); Tr. at 19:25-20:3 (Finnell).

6.      The purpose of the Agreement was to transfer Chesapeake's undivided right, title, and interest in the well, the associated properties, and the wellbore[5] to Garner's Well Service.  See Agreement at 1-3; Tr. at 19:17-20 (Finnell).

7.      "Chesapeake Exploration, L.L.C." is listed as the assignor on the Agreement, and its representative signed the Agreement.  See Agreement at 4.

---

[4]In their written submissions with the Court and at the hearing, Chesapeake Operating and Chesapeake Exploration refer to themselves collectively as Chesapeake and do not readily distinguish between these two entities in their discussion of the facts underlying this case.  The Court similarly refers to them collectively as Chesapeake unless referring to one of the two entities specifically is more accurate.

[5]"A wellbore is any hole drilled for the purpose of exploration or extraction of natural resources such as water, gas or oil where a well may be produced and a resource is extracted for a protracted period of time."  See Wellbore, Wikipedia, http://en.wikipedia.org/wiki/Wellbore (last visited Dec. 20, 2011).

8.      "Garner Well Service, LLC" is listed as the assignee on the Agreement, and its representative, Garner, signed the Agreement.  See Agreement at 4.

9.      Exhibit A to the Agreement describes the location of the property, which is located in Chaves County, New Mexico.  See Agreement at 5.

10.      The Agreement was recorded in Chaves County.  See Agreement at 5; Tr. at 20:24-25 (Nieman, Finnell).

11.      Chesapeake believed that, because it had sold the well to Garner's Well Service and because Garner's Well Service had made certain representations to them, that Garner's Well Service would assume operations of the well.  See Complaint ¶¶ 39-40, at 7; Tr. at 20:2-4 (Finnell).

12.      Before the BLM will recognize a new owner of a federal well as the operator of that well for purposes of federal regulations, the new operator must submit certain information in writing to the BLM.  See Tr. at 21:11-21 (Nieman, Finnell).

13.      Specifically, the new operator must submit in writing to the BLM a change of operator form and post a security bond for the well.  See Tr. at 21:18-21 (Finnell).

14.      Under the Agreement, Garner's Well Service agreed to take these steps to have the BLM recognize it as the new operator for the well.  See Agreement at 3; Tr. at 21:22-22:15 (Nieman, Finnell).

15.      Under the Agreement, Garner's Well Service agreed to the following:

In addition, Assignee hereby assumes and shall be responsible for and pay all claims affecting or arising, directly or indirectly, at any time in connection with the Property for environmental cleanup, remediation, or compliance, or for any other relief, arising directly or indirectly from or incident to, the use, occupation, operation, maintenance or abandonment of or production from the Property, or condition of the Property, whether latent or patent . . . .

Agreement at 3.  Accord Tr. at 22:8-15 (Finnell).

-4-

16.     Garner's Well Service submitted a change of operator form to the BLM.  See Tr. at 24:15-19 (Nieman, Finnell).

17.     The BLM sent a letter indicating that it had not accepted Garner's Well Service's change of operator form, because it "did not obtain a $10,000 Individual Lease (I/L) or $25,000.00 Statewide (S/W) BLM Bond and over 90 days . . . passed since the" change of operator form was received.  Letter from Angel Mayes, Assistant Field Manager, Bureau of Land Management to Garner's Well Service L.L.C. at 1 (dated June 7, 2011)(Plaintiff's Exhibit 2).

18.     Chesapeake attempted to contact Garner's Well Service regarding its obligations to change the operator with the BLM.  See Tr. at 25:17-20 (Nieman, Finnell).

19.     Chesapeake received no response from Garner's Well Service regarding this issue. See Tr. at 25:21-22 (Nieman, Finnell).

20.     Chesapeake has not received documentation from Garner's Well Service demonstrating that it has ever completed the process of changing the operator on the well with the BLM.  See Tr. at 25:23-26:2 (Nieman, Finnell).

21.     Chesapeake does not have the capability to file the required forms with the BLM, as the BLM requires the person receiving the new status as operator of a well to be the one who initiates the transfer proceedings with the BLM.  See Tr. at 26:13-21 (Nieman, Finnell).

22.     The BLM eventually inspected this well and directed Chesapeake to take the following actions regarding the condition of the well: (i) "[r]econstruct [the] containment berms/dikes around produced water tank, separation, and treatment equipment"; (ii) "[r]emove open drum of fluid and idle drums" and "[d]ispose of fluids at an authorized facility"; (iii) "[m]aintain facility fencing to keep livestock out and off of containment berms"; and (iv) "[r]emove oil field debris and dispose of it at an authorized facility, i.e. muffler, filter, unneeded hoses, plumbing

-5-

fittings, and all nonessential equipment." Notice of Orders of the BLM Authorized Officer at 1-2 (dated February 1, 2010)(Plaintiff's Exhibit 3)("Notice"). Accord Tr. at 27:2-8 (Nieman, Finnell).

23.     On October 14, 2010, Chesapeake mailed a letter to Jeffrey M. Johnston, the attorney at that time for Garner's Well Service, in Midland, Texas. See Letter from J. Jacob Reeves to Jeffrey M. Johnston (dated October 14, 2010)(Plaintiff's Exhibit 4)("Oct. 14, 2010 Letter").

24.     That Oct. 14, 2010 Letter informed Mr. Johnston that Chesapeake demanded that Garner's Well Service "initiate the process to transfer operations of the Well immediately" pursuant to the federal regulations. Oct. 14, 2010 Letter at 1.

25.     The Oct. 14, 2010 Letter refers specifically to the Dana Federal 1 well and to the Notice that Chesapeake had received from the BLM regarding violations occurring on the property where the well is located. See Oct. 14, 2010 Letter at 1.

26.     The Oct. 14, 2010 Letter states that Chesapeake intends, for the purpose of avoiding fines, to enter the property where this well is located to "cure the alleged non-compliance shortly." Oct. 14, 2010 Letter at 1.

27.     The Oct. 14, 2010 Letter informed Garner's Well Service that it was Chesapeake's position that Garner's Well Service's conduct constituted a breach of the Agreement and that Chesapeake planned to take legal action if necessary. See Oct. 14, 2010 Letter at 1.

28.     Chesapeake entered the property to cure the incidents of noncompliance. See Tr. at 30:12-15 (Nieman, Finnell).

29.     To fix these incidents of noncompliance on the property containing the Dana Federal 1 well, Chesapeake sent out two crews of people to rebuild the fire wall around the well, fix the fence, clean up the debris on the property, and remove the barrel with the open top. See Tr. at 30:23-31:1 (Finnell).

30.     That work required Chesapeake to expend $2,539.23.  See Tr. at 30:23-31:1 (Finnell); Declaration of Jeffrey G. Finnell ¶ 8, at 3, filed October 14, 2011 (Doc. 12)("Declaration").

31.     If Chesapeake had not fixed the incidents of noncompliance, it could have been fined $250.00 per day of noncompliance, up to a total of $25,000.00, and some of Chesapeake's employees could face imprisonment.  See Tr. at 31:2-11 (Nieman, Finnell).

32.     The BLM could have also terminated the oil and gas lease as a penalty for noncompliance.  See Tr. at 31:12-19 (Nieman, Finnell).

33.     The termination of this oil and gas lease could affect other leases Chesapeake has with the BLM.  See Tr. at 31:20-22 (Nieman, Finnell).

34.     Based on the previous incident of noncompliance and the continued failure to maintain the Dana Federal 1 well, it is more likely than not that Garner and Garner's Well Service will not comply with the respective federal regulations affecting the Dana Federal 1 well.  See Tr. at 31:23-32:9 (Nieman, Finnell).

35.     Not operating a well and not maintaining a well can result in a well leaks, environmental hazards, and other potential dangers.  See Tr. at 32:10-18 (Nieman, Finnell).

36.     The potential harms Chesapeake will face if it does not plug the Dana Federal 1 well are future incidents of noncompliance, costs and liability associated with environmental releases, and the potential to lose other federal leases it has with the BLM.  See Tr. at  31:20-22, 32:19-33:7 (Nieman, Finnell).

37.     To plug the well, Chesapeake will have to hire a contractor to enter the property with a rig and begin to plug the wellbore.  See Tr. at 35:16-18 (Finnell).

38.     The contractor would need to enter the well and set cement plugs at different depths to secure the wellbore, prevent the contamination of fresh water, and prevent the loss of oil or gas

from the plugged wellbore.  See Tr. at 35:18-22 (Finnell).

39.     The contractor would then cut off the casing at the surface and install a dry hole marker.  See Tr. at 35:22-23 (Finnell).

40.     Chesapeake would then need to haul away the surface equipment on the property and remediate the site by restoring the site to its previous condition, including cleaning up any environmental contamination.  See Tr. at 35:24-36:5 (Finnell).

41.     A contractor provided an estimate of $40,020.00 for its services related to assisting Chesapeake to plug the Dana Federal 1 well.  See Letter from Gary Eggleston to Jeff Finnell at 1-2 (dated September 26, 2011)(Plaintiff's Exhibit 6)("Sept. 26, 2011 Letter").

42.     When plugging the wellbore, Chesapeake would have to acquire certain surface rental equipment, including blowout preventers, to comply with federal regulations.  See Tr. at 37:24-38:3 (Finnell).

43.     Renting that surface equipment would cost $1,000.00 per day.  See Tr. at 37:24-38:3 (Finnell).

44.     Chesapeake would require five days using that equipment to plug the well.  See Tr. at 37:24-38:5 (Finnell).

45.     Chesapeake would incur trucking expenses from the use of third-party trucking services while plugging the well, which would cost approximately $5,000.  See Plugging Cost Estimate at 1 (Plaintiff's Exhibit 5); Tr. at 38:4-8 (Finnell).

46.     Chesapeake would have to pay a supervisor at the site to oversee the work and would pay him a rate of $1,000.00 a day for five days.  See Plugging Cost Estimate at 1; Tr. at 38:9-11 (Finnell).

47.     Chesapeake would have to pay engineering staff for technical work Chesapeake

would need to do along with the BLM to ensure the Dana Federal 1 well has been plugged in accordance with federal requirements, which would cost $2,000.00. <u>See</u> Plugging Cost Estimate at 1 (Plaintiff's Exhibit 5); Tr. at 38:13-18 (Finnell).

48.     Reclamation is the process of remediating the soil at an oil and gas well, which requires taking soil samples to make sure the land is in compliance with the respective regulations. <u>See</u> Tr. at 38:19-24 (Finnell).

49.     $15,000 is a reasonable estimate of the amount of money this reclamation process will require at the Dana Federal 1 well. <u>See</u> Plugging Cost Estimate at 1; Tr. at 38:19-24 (Finnell).

50.     Unforeseen costs, such as high levels of soil contamination, often require additional contingency funds to address those problems. <u>See</u> Tr. at 38:25-39:6 (Finnell).

51.     A reasonable estimate of contingency costs as the Dana Federal 1 well site would be $7,000.00. <u>See</u> Plugging Cost Estimate at 1; Tr. at 38:19-39:6 (Finnell).

52.     Including the cost of the contractor, a reasonable estimate of the total costs the Plaintiffs would incur in plugging the well would be $79,000.00. <u>See</u> Plugging Cost Estimate at 1 (Plaintiff's Exhibit 5); Tr. at 36:6-12 (Nieman, Finnell).

53.     Garner's Well Service has not taken the necessary steps, and does not plan to take the necessary steps, to operate or to maintain the Dana Federal 1 well in compliance with federal regulations. <u>See</u> Tr. at 36:19-37:1 (Nieman, Finnell).

## PROCEDURAL BACKGROUND

On April 15, 2011, Chesapeake filed this lawsuit against the Defendants and asserted the following claims: (i) Breach of Contract; (ii) Breach of the Duty of Good Faith and Fair Dealing; (iii) Misrepresentation; (iv) Punitive Damages; and (v) Injunctive Relief. <u>See</u> Complaint. Chesapeake served Garner's Well Service with copies of the Complaint and a summons on June 11,

2011.  See Summons in a Civil Action at 1-2 (served June 1, 2011), filed June 29, 2011 (Doc. 5).

Chesapeake served Garner with copies of the Complaint and a summons on June 11, 2011.  See

Summons in a Civil Action at 1-2 (served June 1, 2011), filed June 29, 2011 (Doc. 6).  Garner and

Garner's Well Service have not yet filed a responsive pleading or otherwise defended the lawsuit.

Pursuant to rule 12(a)(1)(A) of the Federal Rules of Civil Procedure, Garner's and Garner's

Wells Service's answers were due on July 5, 2011, the first non-weekend and non-holiday date

following twenty-one days from the date of service.  See Fed. R. Civ. P. 6(a), 12(a)(1)(A).  On

October 14, 2011, Chesapeake filed its Praecipe, detailing its service of process on Garner and

Garner's Well Service, stating that they have not yet answered, and asserting that Chesapeake seeks

a default judgment under rule 55(a) of the Federal Rules of Civil Procedure.  See Doc. 10.  On

October 14, 2011, Chesapeake filed its Affidavit of Non-Military Service to indicate that Nathan

T. Nieman, one of Chesapeake's attorneys,  "accessed the Department of Defense Manpower Data

Website in order to determine whether Defendant Devin Garner was engaged in military service for

the United States." Doc. 11 ("Nieman Aff.").  The affidavit indicates that Mr. Nieman searched the

respective online database using Garner's birthdate and name, and that the Department of Defense

Manpower Data Center does not possess any information indicating Garner's individual status.  See

Nieman Aff. at 1.  Chesapeake attached the results of this search to the affidavit.  See Nieman

Affidavit at 3-4.

On October 14, 2011, Chesapeake moved the Court to enter a default judgment against

Garner and Garner's Well Service under rule 55.  See Motion for Default Judgment at 1 (Doc. 13).

On November 8, 2011, the Clerk of Court entered its Clerk's Entry of Default to indicate that

Garner and Garner's Well Service have defaulted in this case.  See Doc. 15.  On November 29,

2011, the Court entered a default judgment against  Garner and Garner's Well Service on Counts

-10-

1 through 3 and Count 5, because it concluded that the procedural facts in this case warrant entry of a default judgment. See Default Judgment at 1-2 (Doc. 16). The Court did not enter a default judgment regarding any of Chesapeake's requested remedies, including their request for injunctive relief. See Default Judgment at 1-2. Once Chesapeake began to pursue a default judgment, it has not requested that the Court award it punitive damages and has not presented any evidence regarding punitive damages.

At the December 13, 2011 hearing, the Court requested that Chesapeake attempt to contact Garner and Garner's Well Service or their counsel. See Tr. at 3:6-13 (Court). Chesapeake noted that they had the number for an attorney, Mr. Johnston, who had at one time represented Garner's Well Service, but stated that this attorney has not appeared in this action. See Tr. at 3:14-24 (DeBrine, Court). Once Chesapeake provided Mr. Johnston's number to the Court, the courtroom deputy contacted Mr. Johnston to inform him regarding the entry of default and the nature of the proceedings. See Tr. at 4:24-5:24 (Wild, Johnston). The Court inquired whether Mr. Johnston would like to participate in the hearing. See Tr. at 6:13-19 (Court). Mr. Johnston informed the Court that he believed that Garner and Garner's Well Service had already resolved these matters. See Tr. at 6:20-25 (Johnston). He noted that he has represented Garner's Well Service in the past, but stated he has been unable to contact the company for several months. See Tr. at 7:2-12 (Johnston). Mr. Johnston asserted that he did not believe he has ever qualified to appear in federal court in New Mexico, but noted that he was licensed to practice in New Mexico. See Tr. at 7:14-18 (Johnston). The Court inquired whether Mr. Johnston would like to participate in the hearing, or would prefer to listen in on the hearing and then relay some of the information to the Defendants. See Tr. at 7:19-23 (Court). Mr. Johnston emphasized that he is not sure if his attorney-client relationship with Garner's Well Service still exists, but stated that he would be willing to listen to

the hearing without entering an appearance.  See Tr. at 7:24-8:20 (Johnston, Court); id. at 11:8-16 (Court, Johnston). Chesapeake then recounted the history of the case to update Mr. Johnston on the case.  See Tr. at 9:18-11:17 (Johnston, DeBrine, Court).  Mr. Johnston in turn provided the Court with the most recent telephone number he had for Garner's Well Service -- 482-894-2642.  See Tr. at 11:18-22 (Johnston).  The courtroom deputy then attempted to contact Garner's Well Service at this telephone number.  See Tr. at 13:9-14:13 (Court, Johnston, Wild).  No one answered the line, and the courtroom deputy left a voicemail for Garner's Well Service informing it of the hearing and providing it with information to allow it to appear in the hearing by telephone or to contact the Court's staff.  See Tr. at 13:16-14:13 (Wild).  The Court left its speaker telephone on throughout the hearing, so that Garner's Well Service could call to make an appearance in the hearing.  Mr. Johnston stayed on the line throughout the hearing.  No one else called into the telephone line during the hearing.  The Court then proceeded with the hearing on damages.  See Tr. at 14:17-21 (Court). The Court noted that its concern in calling the hearing was that it needed additional evidence to support the entry of the requested damages and injunctive relief.  See Tr. at 14:22-15:13 (Court).

Chesapeake recounted that this case involves the sale of interests in a federal oil and gas lease.  See Tr. at 15:14-17 (Debrine).  Chesapeake stated that it had sold one of these interests through an internet auction to Garner's Well Service in November 2008.  See Tr. at 15:15-18 (DeBrine).  Chesapeake asserted that Garner's Well Service had applied with the BLM to change the operator of the well on one of these interests to make itself the operator.  See Tr. at 15:22-16:8 (DeBrine).  Chesapeake noted that the BLM rejected this application, because Garner's Well Service had not posted the required federal bond.  See Tr. at 16:2-4 (DeBrine).  Chesapeake contended that, as a result of these circumstances, the BLM still looks to it as the operator of record on the well who bears responsibility for bringing the well into compliance with federal regulations.  See Tr. at 16:5-8

-12-

(DeBrine).  Chesapeake noted that the BLM had issued a notice of noncompliance in September

2010 based on the condition of the well.  <u>See</u> Tr. at 16:8-10 (DeBrine).  Chesapeake asserted that

it then contacted Garner's Well Service and told it to address these issues.  <u>See</u> Tr. at 16:10-11

(DeBrine).  Chesapeake asserted that, because Garner's Well Service did not resolve these matters,

Chesapeake had to become involved in remedying the problems itself and resolving the situation

with the BLM.  <u>See</u> Tr. at 16:12-13 (DeBrine).  Chesapeake stated that it has engaged in a variety

of correspondence with Garner's Well Service to encourage it to take the steps necessary to assume

the operating role over the well, but that the present lawsuit eventually became necessary.  <u>See</u> Tr.

at 16:14-24 (DeBrine).

Following the presentation of their evidence, Chesapeake emphasized that its expert witness,

Mr. Jeffrey Finnell, is experienced in these matters and in estimating the potential costs for projects

such as plugging an oil well.  <u>See</u> Tr. at 40:8-15 (Nieman).  Chesapeake asserted that, to effectively

remedy the regulatory situation with the BLM, it will need to enter the land containing the Dana

Federal 1 well and plug that well.  <u>See</u> Tr. at 40:22-41:7 (Nieman).  The Court asked for clarification

regarding the location of the county containing the Dana Federal 1 well.  <u>See</u> Tr. at 41:8-12 (Court).

Chesapeake clarified that, even though there was a stray reference in its Complaint to Lea County,

New Mexico, the well is in Chaves County.  <u>See</u> Tr. at 41:8-16 (Court, DeBrine).

## LAW REGARDING CALCULATION OF DAMAGES
## <u>FOLLOWING ENTRY OF DEFAULT JUDGMENT ON LIABILITY</u>

After entering default judgment, a district court takes all of the well-pleaded facts in a

complaint as true.   <u>See</u> <u>United States v. Craighead</u>, 176 F.App'x 922, 925 (10th Cir.

2006)(unpublished); <u>Flaks v. Koegel</u>, 504 F.2d 702, 707 (2d Cir. 1974)("While a default judgment

constitutes an admission of liability, the quantum of damages remains to be established by proof

unless the amount is liquidated or susceptible of mathematical computation." (citations omitted)).

"If defendant does not contest the amount prayed for in the complaint [by failing to answer] and the claim is for a sum certain or a sum that can be made certain by computation, the judgment generally will be entered for that amount without any further hearing." United States v. Craighead, 176 F.App'x at 925 (alteration in original)(quoting 10A C. Wright & Miller, Federal Practice and Procedure § 2688 (3d ed. 1998)). See Fed. R. Civ. P. 8(d)("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading."). A court may enter a default judgment for a damage award without a hearing if the amount claimed is "one capable of mathematical calculation." Applied Capital, Inc. v. Gibson, 558 F.Supp.2d 1189, 1202 (D.N.M. 2007)(Browning, J.)(quoting H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d 145, 148 (10th Cir. 1985)(citing Venable v. Haislip, 721 F.2d at 300). "It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly." C. Wright & Miller, supra, § 2688 (quoting Pope v. United States, 323 U.S. 1, 12 (1944)). "If the damages sum is not certain or capable of easy computation, the court may" conduct such hearings or order such references as it deems necessary. Applied Capital, Inc. v. Gibson, 558 F.Supp.2d at 1202 (citing Beck v. Atl. Contracting Co., 157 F.R.D. 61, 64 (D. Kan. 1994)). See Fed. R. Civ. P. 55(b)(2)(B)("The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages.").

## LAW REGARDING REMEDIES UNDER NEW MEXICO LAW

If the damages are not certain or capable of easy mathematical calculation, a court must employ the measure of damages applicable to the claim before entering a default judgment for those

amounts.  Chesapeake brings claims for violations of New Mexico law.  The Court will need to look at the measure of the damages for each claim for which Chesapeake has secured a default judgment in order to determine the proper award of damages.

**1.      Contract Damages.**

"[T]he purpose of allowing damages in a breach of contract case is the restoration to the injured of what he has lost by the breach, and what he reasonably could have expected to gain if there had been no breach." Bd. of Educ. of Alamogordo Pub. Sch. Dist. No. 1 v. Jennings, 102 N.M. 762, 765, 701 P.2d 361, 364 (1985).  A plaintiff's damages must be reasonably certain and follow from the breach for those damages to be recoverable.  See Strata Prod. Co. v. Mercury Exploration Co., 121 N.M. 622, 632, 916 P.2d 822, 833 (1996).  As the Supreme Court of New Mexico has stated:

> Parties, when they enter into contracts, may well be presumed to contemplate the ordinary and natural incidents and consequences of performance or non-performance; but they are not supposed to know the condition of each others affairs, nor to take into consideration any existing or contemplated transactions, not communicated nor known, with other persons.

Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. 436, 447, 891 P.2d 1190, 1201 (1995). A plaintiff may recover "[c]onsequential (or special) damages . . . if they do not duplicate the recovery" the plaintiff has already received for his expectation for the benefits under the contract.

Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. at 444, 891 P.2d at 1198.

> Special damages may be allowed for items of loss more or less peculiar to the plaintiff, which may not be expected to occur regularly to other plaintiffs in similar circumstances, and are a likely loss within the contemplation of the parties at the time of contracting.  Stated another way, special provable damages flow from the disappointment of a special purpose for the subject matter of the contract or from unusual circumstances, either or both of which were known to the parties when they contracted.  In such a case, the amount permitted under the general damage formula, alone, clearly will either be inadequate or nonexistent.

Camino Real Mobile Home Park P'Ship v. Wolfe, 119 N.M. at 446, 891 P.2d at 1200.  Special damages are foreseeable when there is "an explicit or tacit agreement by the defendant 'to respond in damages for the particular damages understood to be likely in the event of a breach.'"  Camino Real Mobile Home Park P'Ship v. Wolfe, 119 N.M. at 446, 891 P.2d at 1200 (quoting Wall v. Pate, 104 N.M. 1, 2, 715 P.2d 449, 450 (1986)).

**2.      Breach of Duty of Good Faith and Fair Dealing Damages.**

The Supreme Court of New Mexico has indicated that "the duty to not act in bad faith or deal unfairly" imposed by an implied covenant of good faith and fear dealing within a contract "becomes part of the contract and the remedy for its breach is on the contract itself."  Bourgeous v. Horizon Healthcare Corp., 117 N.M. 434, 439, 872 P.2d 852, 857 (1994)(discussing an Arizona case and distinguishing this measure of damages from tort damages that are available for breach of this covenant in the insurance context).  In the insurance context, however, a plaintiff can recover tort damages for breach of this implied covenant.  See Bourgeous v. Horizon Healthcare Corp., 117 N.M. at 439, 872 P.2d at 857.  In spite of the general bar on punitive damages for breach of contract cases, the Supreme Court of New Mexico has recognized that punitive damages may be recoverable under some circumstances for breaches of the implied covenant of good faith and fair dealing.  See Romero v. Mervyn's, 109 N.M. 249, 257, 784 P.2d 991, 1000 (1989).

**3.      Negligent-Misrepresentation Damages.**

"Damages for negligent misrepresentation are those proximately caused by the misrepresentation."  See First Interstate Bank v. Foutz, 107 N.M. 749, 751, 764 P.2d 1307, 1309 (1988).  The Supreme Court of New Mexico has adopted the following measure of damages for a claim for negligent misrepresentation:

**Damages for Negligent Misrepresentation**

(1)     The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is a legal cause, including

       (a)     the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

       (b)     pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

(2)     The damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

First Interstate Bank v. Foutz, 107 N.M. at 751, 764 P.2d at 1309 (quoting Restatement (Second) of Torts § 552B (1977)).  "[D]amages for negligent misrepresentation are determined by out-of-pocket loss or reliance damages."  First Interstate Bank v. Foutz, 107 N.M. at 751, 764 P.2d at 1309.

### 4.     **Injunctive Relief.**

The Tenth Circuit "appl[ies] the law of the forum state in determining whether to grant mandatory injunctive relief in diversity cases."  Mid-America Pipeline Co. v. Lario Enters., 942 F.2d 1519, 1523 (10th Cir. 1991).  "In determining whether to grant injunctive relief, a trial court must consider a number of factors and 'balance the equities and hardships.'"  Insure N.M., LLC v. McGonigle, 128 N.M. at 614, 995 P.2d at 1056.  The factors to consider are:

(1) [T]he character of the interest to be protected, (2) the relative adequacy to the plaintiff of injunction in comparison with other remedies, (3) the delay, if any, in bringing suit, (4) the misconduct of the plaintiff if any, (5) the interest of third persons, (6) the practicability of granting and enforcing the order or judgment, and (7) the relative hardship likely to result to the defendant if an injunction is granted and to the plaintiff if it is denied.

Appel v. Presley Cos., 111 N.M. 464, 467, 806 P.2d 1054, 1057 (1991)(alteration in original).  "Injunctions are harsh and drastic remedies [that] should issue only in extreme cases of pressing

necessity and only where there is no adequate . . . remedy at law." Hill v. Cmty. of Damien of Molokai, 121 N.M. 353, 369, 911 P.2d 861, 877 (1996)(alteration in original)(internal quotation marks omitted).  "The granting of an injunction is an equitable remedy, and whether to grant equitable relief lies within the sound discretion of the trial court." Insure N.M., LLC v. McGonigle, 128 N.M. at 614, 995 P.2d at 1056.

<u>ANALYSIS</u>

After considering the evidence that Chesapeake has presented, the Court concludes that the evidence supports their requested amount of damages -- $2,539.23 for its expenses in curing the incidents of noncompliance related to the Dana Federal 1 well and $79,000.00 to plug the Dana Federal 1 well.  After balancing Chesapeake's and Garner's and Garner's Well Service's respective circumstances, the Court also concludes that the evidence supports entering Chesapeake's requested permanent injunction to allow it to enter the land to plug the Dana Federal 1 well, and to remove itself as the owner/operator of the well.

**I.     THE COURT WILL AWARD CHESAPEAKE'S REQUESTED DAMAGES OF $81,539.23.**

The Court has entered Default Judgment as to liability against Garner and Garner's Well Service.  Because of this judgment, the Court takes all of the well-pled facts in the Complaint as true.  See United States v. Craighead, 176 F.App'x at 924-25.  Additionally, it is worth noting that Chesapeake presented evidence at the hearing which further supports a finding that Garner and Garner's Well Service are liable.  In United States v. Craighead, the Tenth Circuit addressed a defendant's argument that a district court had improperly entered default judgment against him, because the court did not have subject-matter jurisdiction and because "the record contains only the theories and conclusions of counsel purporting to represent the United States -- no notes and no

-18-

authenticated documents."   176 F.App'x at 924.   The Tenth Circuit rejected the defendant's

argument, stating:

> The fatal flaw in Mr. Craighead's argument is that it rests on the faulty premise that
> the district court could not enter default judgment unless the government proved the
> factual allegations contained in its complaint.   On the contrary, Mr. Craighead
> relieved the government of the burden of proving its factual allegations, including
> the allegations supporting constitutional standing, by failing to answer the complaint.
> "The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact,
> is concluded on those facts by the judgment, and is barred from contesting on appeal
> the facts thus established."

176 F.App'x at 924-25 (emphasis added).   See Two Old Hippies, LLC v. Catch the Bus, LLC, No.

10-0459, 2011 WL 3939177, at *12 (D.N.M. Aug. 31, 2011)(Browning, J.).

Thus, Chesapeake has no obligation to prove that Garner and Garner's Well Service are

liable following the entry of default based on the well-pled allegations in their pleadings.   Liability

for the breach of contract claim, the breach of the duty of good faith and fair dealing claim, and the

negligent misrepresentation claim has already been established.   The Court concludes that, under

New Mexico law, the measure of damages for the breach of contract claim and the breach of the

duty of good faith and fair dealing claim would be the same.   See Bourgeous v. Horizon Healthcare

Corp., 117 N.M. at 439, 872 P.2d at 857.   Chesapeake has not sought punitive damages as part of

entry of default judgment, so the Court does not need to address whether punitive damages would

be available for the breach of the duty of good faith and fair dealing claim.

The Supreme Court of New Mexico has adopted the following measure of damages for a

claim for negligent misrepresentation:

**Damages for Negligent Misrepresentation**

(1)   The damages recoverable for a negligent misrepresentation are those
necessary to compensate the plaintiff for the pecuniary loss to him of which
the misrepresentation is a legal cause, including

-19-

      (a)     the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

      (b)     pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.

   (2)    The damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.

First Interstate Bank v. Foutz, 107 N.M. at 751, 764 P.2d at 1309 (quoting Restatement (Second) of Torts § 552B (1977)).  Here, the misrepresentations at issue are as follows:

> Defendants represented to Chesapeake that Defendants would be responsible for and comply with all duties associated with the Dana Federal 1 well site, including those imposed by any government authority, would be responsible for any clean-up, remediation, or compliance related to the Dana Federal 1 well site, and would comply with any government request.

Complaint ¶ 39, at 7.  Garner and Garner's Well Service also represented "that they either had or would register with the BLM, as the owner/operator of the Dana Federal 1 well."  Complaint ¶ 40, at 7.  As the Court's findings of fact indicate, Chesapeake incurred the $2,539.23 in expenses when it had to remedy Garner's and Garner's Well Service's failure to comply with certain federal regulations, which Garner and Garner's Well Service represented that they would do.  Additionally, the Dana Federal 1 well imposes an ongoing risk of additional costs to Chesapeake until someone plugs the well.  There is no evidence suggesting that Garner and Garner's Well Service have the intention of operating the Dana Federal 1 well in a manner that will avoid additional costs for noncompliance with federal regulations or from environmental contamination arising out of non-maintenance.  Chesapeake has presented evidence that, if the well remains unplugged, it could result in significant fines for it if the condition of the well deteriorates and could also result in it losing other leases with the BLM.  The Court has evaluated the Chesapeake's estimates of the cost to fix the well.  As the Court's findings of fact and the evidence presented at the hearing establish,

$79,000.00 is a reasonable estimate of the cost to plug the well.  Furthermore, Garner's and Garner's Well Service's misrepresentations that they would comply with the respective federal regulations and take the steps necessary to assume the duty of operating the Dana Federal 1 well are the legal cause of these damages.

The measure of damages under a breach of contract theory is more complex under these facts.  "[T]he purpose of allowing damages in a breach of contract case is the restoration to the injured of what he has lost by the breach, and what he reasonably could have expected to gain if there had been no breach." Bd. of Educ. of Alamogordo Pub. Sch. Dist. No. 1 v. Jennings, 102 N.M. at 765, 701 P.2d at 364.  These damages are referred to as general damages.  See Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. at 447, 891 P.2d at 1201.  For those damages to be recoverable, a plaintiff's damages must be reasonably certain and follow from the breach.  See Strata Prod. Co. v. Mercury Exploration Co., 121 N.M. 622, 632, 916 P.2d 822, 833 (1996).  The Supreme Court of New Mexico has further explained regarding general damages:

> The damages that arise naturally and necessarily as the result of the breach are considered general damages, which are based on the concept that "the plaintiff should be awarded the value of the very thing promised so that his balance sheet will reflect capital assets he would have had upon the defendant's full performance."

Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. at 443, 891 P.2d at 1197.  Here, the damages Chesapeake seeks do not relate to what it expected to receive under the contract had Garner's Well Service performed.  In other words, the costs related to curing Garner's Well Service noncompliance with the federal regulations and the costs of plugging the well are not "the value of the very thing promised" that would make Chesapeake's "balance sheet . . . reflect capital assets [they] would have had upon the defendant[s'][] full performance." Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. at 443, 891 P.2d at 1197.

-21-

Chesapeake may recover these damages under a breach of contract theory, however, as consequential damages.  The Supreme Court of New Mexico has stated:

> Parties, when they enter into contracts, may well be presumed to contemplate the ordinary and natural incidents and consequences of performance or non-performance; but they are not supposed to know the condition of each others affairs, nor to take into consideration any existing or contemplated transactions, not communicated nor known, with other persons.

Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. at 447, 891 P.2d at 1201. A plaintiff may recover "[c]onsequential (or special) damages . . . if they do not duplicate the recovery" the plaintiff has already received for his expectation for the benefits under the contract.  Camino Real Mobile Home Park P'ship v. Wolfe, 119 N.M. at 444, 891 P.2d at 1198.

> Special damages may be allowed for items of loss more or less peculiar to the plaintiff, which may not be expected to occur regularly to other plaintiffs in similar circumstances, and are a likely loss within the contemplation of the parties at the time of contracting.  Stated another way, special provable damages flow from the disappointment of a special purpose for the subject matter of the contract or from unusual circumstances, either or both of which were known to the parties when they contracted.  In such a case, the amount permitted under the general damage formula, alone, clearly will either be inadequate or nonexistent.

Camino Real Mobile Home Park P'Ship v. Wolfe, 119 N.M. at 446, 891 P.2d at 1200.  Special damages are foreseeable when there is "an explicit or tacit agreement by the defendant 'to respond in damages for the particular damages understood to be likely in the event of a breach.'"  Camino Real Mobile Home Park P'Ship v. Wolfe, 119 N.M. at 446, 891 P.2d at 1200.  Here, there was an explicit agreement that Garner's Well Service would take the steps necessary to become the operators of the Dana Federal 1 well, including taking the required steps with the BLM to become the operator of the well.  Under the Agreement, Garner's Well Service agreed to the following:

> In addition, Assignee hereby assumes and shall be responsible for and pay all claims affecting or arising, directly or indirectly, at any time in connection with the Property for environmental cleanup, remediation, or compliance, or for any other relief, arising directly or indirectly from or incident to, the use, occupation, operation,

-22-

> maintenance or abandonment of or production from the Property, or condition of the Property, whether latent or patent . . . .

Agreement at 3.  Accord Tr. at 22:8-15 (Finnell).  The requested damages fall within the scope of this contractual provision.  Thus, there is an agreement that Garner's Well Service will assume responsibility for these damages.  As the Court has discussed already, the $2,539.23 and $79,000.00 are reasonable estimates of the damages Chesapeake has already suffered and what it will require to plug the well.  Thus, the Court awards Chesapeake $81,539.23 in damages.

## II.   THE COURT WILL ENTER A PERMANENT INJUNCTION THAT WILL ALLOW CHESAPEAKE TO ENTER GARNER'S AND GARNER'S WELL SERVICE'S PROPERTY, TO PLUG THE DANA FEDERAL 1 WELL, AND TO REMOVE ITSELF AS OWNER/OPERATOR OF THE WELL.

The Tenth Circuit "appl[ies] the law of the forum state in determining whether to grant mandatory injunctive relief in diversity cases."  Mid-America Pipeline Co. v. Lario Enters., 942 F.2d at 1523.  "In determining whether to grant injunctive relief, a trial court must consider a number of factors and 'balance the equities and hardships.'"  Insure N.M., LLC v. McGonigle, 128 N.M. at 614, 995 P.2d at 1056.  The factors to consider are:

> (1) [T]he character of the interest to be protected, (2) the relative adequacy to the plaintiff of injunction in comparison with other remedies, (3) the delay, if any, in bringing suit, (4) the misconduct of the plaintiff if any, (5) the interest of third persons, (6) the practicability of granting and enforcing the order or judgment, and (7) the relative hardship likely to result to the defendant if an injunction is granted and to the plaintiff if it is denied.

Appel v. Presley Cos., 111 N.M. at 467, 806 P.2d at 1057 (alteration in original).  "Injunctions are harsh and drastic remedies [that] should issue only in extreme cases of pressing necessity and only where there is no adequate . . . remedy at law."  Hill v. Cmty. of Damien of Molokai, 121 N.M. 353 at 369, 911 P.2d at 877 (alteration in original)(internal quotation marks omitted).  "The granting of an injunction is an equitable remedy, and whether to grant equitable relief lies within the sound

discretion of the trial court." Insure N.M., LLC v. McGonigle, 128 N.M. at 614, 995 P.2d at 1056.

First, the interest to be protected here to some degree involves interests in real property, although Chesapeake has assigned its interest in the land containing the Dana Federal 1 well to Garner and Garner's Well Service. Chesapeake is still listed with the BLM as the operator of this well site. New Mexico courts are more willing to issue injunctions when the character of the interest to be protected involves real property. See Amkco, Ltd. v. Welborn, 130 N.M. 155, 158, 21 P.3d 24, 27 (2001)("It is settled . . . that a given piece of property is considered to be unique, and its loss is always an irreparable injury."). It is worth noting that Chesapeake could potentially face revocation of its other oil and gas leases with the BLM if the BLM finds it is not complying with the applicable federal regulations. Thus, because interests in land are at issue, the character of the interest to be protected here weighs in favor of granting an injunction.

Second, there is no adequate remedy at law, so an injunction is the more appropriate remedy. Chesapeake may suffer a variety of damages if it does not enter the land and clean up the property. It may lose other leases with the BLM, may be responsible for environmental contamination, and may be responsible for other incidents of noncompliance until the well is plugged. There is no way to avoid these damages without allowing it to plug the well. Additionally, Chesapeake has no ability to change the designated owner/operator with the BLM regarding this well, as the Defendants are the only ones who can take that action. Some of Chesapeake's employees could also face imprisonment if the failure to cure instances of noncompliance becomes serious enough.

Third, there is no indication that Chesapeake delayed in bringing suit such that it has unclean hands and should not receive an injunction. As the Oct. 14, 2010 Letter indicates, Chesapeake tried to resolve this matter with the Defendants before bringing this suit on April 15, 2011. See Oct. 14, 2010 Letter at 1. Attempting to resolve a matter with the opposing party before bringing suit weighs

against a finding of delay.  See Wilcox v. Timberon Protective Ass'n, 111 N.M. 478, 487-88, 806 P.2d 1068, 1078 (1990), abrogated on other grounds by C.R. Anthony Co. v. Loretto Mall Partners, 112 N.M. 504, 817 P.2d 238 (1991).  Additionally, the time between sending this letter and filing this suit are not so significant for the Court to conclude that Chesapeake engaged in undue delay.

Fourth, there is no indication that Chesapeake has engaged in any misconduct.  There was no evidence at the hearing or other evidence available to the Court suggesting Chesapeake has engaged in misconduct.  It appears Chesapeake has tried to work out this issue with Garner and Garner's Well Service before bringing suit, but they would not cooperate with Chesapeake.

Fifth, the interests of third persons weighs in favor of granting the injunction.  Not plugging the well could result in environmental contamination if the well remains in a state of neglect or falls into disrepair.  The BLM monitors these wells closely for this reason.  Thus, based on potential environmental contamination, this factor weighs in favor of granting an injunction.

Sixth, there is no indication that it would be impracticable to enter and enforce the injunction.  Garner and Garner's Well Service do not appear to be engaging in any significant degree of activity, if any at all, on the land containing the Dana Federal 1 well.  To accomplish what Chesapeake seeks with the injunction, it must only enter the land and engage in several days work to plug the well.  After that period of time, it will have no additional need to enter the land.  The Court does not foresee any significant conflict or administrative problems that will arise if it issues the injunction as requested.

Seventh, the relative hardships in this case weigh in favor of Chesapeake, and Garner and Garner's Well Service will not likely suffer significant harm.  Garner and Garner's Well Service have not shown an interest in defending this suit or resolving the issues on the land containing the Dana Federal 1 well.  While plugging the well may result in a loss of a source of revenue to Garner

and Garner's Well Service, assuming they still have the intention of operating the well, they have shown no interest in taking the steps necessary to become the operator of the well in the eyes of the BLM.  If Garner and Garner's Well Service had acted in a manner indicating they were interested in maintaining and operating the well, this factor would likely weigh in their favor.  As previously discussed, there are a variety of potential problems for Chesapeake if it does not enter the land and plug the well, such as liability for environmental contamination and the loss of other oil and gas leases with the BLM.  Some of Chesapeake's employees could also face imprisonment if the failure to cure instances of noncompliance becomes serious enough.  Thus, this factor weighs in favor of granting an injunction.

Because the relevant favors weigh significantly in favor of granting a permanent injunction, the Court will grant the requested permanent injunction.  The terms of the injunction are as follows. Chesapeake is entitled to take all necessary actions to plug, abandon, and reclaim the surface of the Dana Federal 1 well, and remove itself as the registered owner/operator of the Dana Federal 1 well site.  Garner and Garner's Well Service must allow Chesapeake to enter the land containing this well in Chaves County, New Mexico that is described in the Agreement assigning the land to Garner's Well Service.  Garner and Garner's Well Service must not otherwise interfere with Chesapeake's actions taken to plug, abandon, and reclaim the surface of the Dana Federal 1 well, and remove itself as the registered owner/operator of the Dana Federal 1 well site.  The injunction will expire three days after completion of the work to plug the well and to remove Chesapeake as the registered owner/operator of the well.

**IT IS ORDERED** that the Court will award damages and a permanent injunction consistent with the request in the Plaintiffs' Motion for Default Judgment, filed October 14, 2011 (Doc. 13). The Court awards Plaintiffs Chesapeake Operating, Inc. and Chesapeake Exploration, L.L.C.

$81,539.23 in damages.  The Court will enter a permanent injunction against Defendants Devin

Garner and Garner's Well Service, L.L.C. consistent with the terms of this Memorandum Opinion

and Order allowing Chesapeake to enter the land containing the Dana Federal 1 well, to plug the

well, and to remove itself as the registered owner/operator of the well.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Earl E. DeBrine, Jr.
Nathan T. Nieman
Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Albuquerque, New Mexico

     *Attorneys for the Plaintiffs*